**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 04 2014, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF CHILD
SERVICES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE
CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
LAKE COUNTY CASA:

**DONALD W. WRUCK, III**
Wruck Paupore, P.C.
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of D.B., Minor Child, and K.S., Mother,               )
)
)
K.S.,                                                                              )
)
　　　Appellant-Respondent,                                 )
)
　　　　　　vs.                                                              )      No. 45A04-1401-JT-25
)
INDIANA DEPARTMENT OF CHILD SERVICES,               )
)
　　　Appellee-Petitioner,                                      )
)
LAKE COUNTY COURT APPOINTED SPECIAL ADVOCATE,                                               )
)
　　　Appellee.                                                      )

**September 4, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

K.S. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, D.B., arguing that the evidence presented was insufficient to support the termination of her parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On January 11, 2012, the Indiana Department of Child Services ("DCS") received a report from police that Mother was having a possible overdose. It was determined that Mother was actually going through withdrawal symptoms, and D.B. was in the home during this, which caused safety concerns. In speaking with Mother, DCS discovered that Mother had been attending a methadone clinic because she was addicted to opiates. She had been kicked out of the program after she threw away a take home methadone dose bottle and had been experiencing withdrawal symptoms for several days. She hoped to get back into the methadone clinic within two weeks. Mother also reported to DCS that she smoked marijuana, but not in the home. At that time, DCS left D.B. in the home with Mother.

On January 24, 2012, DCS filed a child in need of services ("CHINS") petition, alleging Mother was struggling with addiction and had recently been kicked out of a methadone program. On the same day, the juvenile court adjudicated D.B. to be a CHINS

2

upon Mother's admission to the petition. D.B. remained in the home with Mother, and Mother was offered services. On February 22, 2012, the juvenile court issued its dispositional decree and ordered Mother to, among other things: (1) sign all releases necessary for DCS to monitor compliance with the court's order; (2) maintain suitable housing; (3) secure and maintain a legal source of income; (4) refrain from using illegal controlled substances and alcohol and only take valid prescription medications as prescribed; (5) participate in an intensive family preservation program; (6) participate in home-based counseling and demonstrate positive changes; (7) complete a parenting assessment and follow all recommendations; (8) complete a substance abuse assessment and follow all recommendations; (9) submit to random drug screens; (10) complete a psychological evaluation and complete all recommendations; (11) meet with a psychiatrist and take all medications prescribed; (12) return to the methadone clinic or receive drug treatment services; and (13) participate in intensive substance abuse counseling through Crown Counseling. *Pet'r's Exs*. D, E. Mother was required to produce no positive drug screens for anything other than methadone, and if she tested positive, D.B. would be removed from her custody. *Tr*. at 12. Mother failed to comply with services and tested positive for methadone, THC, benzodiazepines, opiates, and cocaine on March 15, 2012. DCS removed D.B. from Mother's care on March 19, 2012 and placed D.B. with a foster family. On July 12, 2012, the juvenile court specifically ordered Mother to sign all necessary releases from the methadone clinic and to go into a detox program. *Appellant's App*. at vi.

During the CHINS case, DCS learned that Mother began abusing drugs as a teenager and, later, used Oxycontin and Vicodin. Mother became addicted to pain pills after she

3

injured her back during childbirth; she receives social security and disability payments for the injury. It was also learned during the DCS investigation that Mother used marijuana. At the time DCS became involved with Mother, she had been participating in the methadone program for about a year, but had been kicked out of the program because she threw away a methadone bottle and failed to return it as the program required. When Mother was accepted back into the methadone program about two weeks later, she was ordered to sign releases in order for DCS to monitor whether her methadone dose was being lowered throughout the program. If her levels got low enough, she could be admitted to an inpatient program, and a doctor could manage her pain. *Tr.* at 19. Mother never signed the releases, and DCS was never able to monitor her methadone levels. Mother consistently refused to participate in an inpatient detox program throughout the CHINS case despite multiple recommendations and a court order in July 2012 to participate in a detox program. Since Mother refused inpatient treatment, she was provided the alternative of intensive substance abuse therapy. Her participation in the substance abuse therapy was inconsistent.

In May 2012, Mother's visitations with D.B. were suspended because Mother was still testing positive for drugs, not attending her substance abuse counseling consistently, and attending her visitations with D.B. under the influence of substances. In October 2012, Mother was still inconsistent with her substance therapy, but she attended at least every other week and tested clean except for methadone. After she provided four to six clean screens, she was allowed to participate in therapeutic supervised visitations with D.B. in January 2013. In February 2013, the juvenile court approved in-home visitation if Mother provided another four to six drug screens; however, she tested positive for cocaine six days

later. By the end of March 2013, Mother was able to provide the required number of clean drug screens to have in-home visitations, but on the day the family case manager ("FCM") inspected her home, Mother tested positive for THC. She had four more screens come back positive for THC. During this time, Mother's methadone levels were unknown because she still had not signed the releases. She would forget about visitations, and when she would attend, the supervisors suspected she was under the influence of something. Mother refused to attend her group substance abuse therapy.

In June, July, and August of 2013, Mother continued to test positive for THC, and one of the screens was also positive for Xanax and cocaine. Mother stated she used marijuana, knowing the CHINS case was pending, because she wanted to "escape life." *Tr*. at 116-17. When it became apparent that a termination petition would be filed, an FCM met with Mother to inquire if her services could be improved in order to obtain her compliance because, if she failed to comply, she would lose her child. Mother requested a different substance abuse counselor, and DCS made a referral for the provider that Mother requested, but Mother stopped attending.

Mother claimed that she sought psychological treatment on her own, but never signed releases to allow DCS to obtain information about such treatment. At the time that visitations were suspended in May 2012, Mother had not yet completed her court-ordered psychological and parenting assessments or attended parenting classes. She finally completed her parenting assessment and began parenting classes in October 2012. Mother stopped attending services and court hearings around July 2013, she failed to respond to attempts to contact her, and the juvenile court ordered that all services stop on August 13, 2013.

Since D.B.'s removal on March 19, 2012, she has been placed with foster parents. D.B. was diagnosed with symptoms of reactive attachment disorder related to her history with Mother. She participated in weekly counseling and was excelling in school. However, D.B.'s behavior and relationship with Mother regressed during and after visitation. There was no affection between Mother and D.B., and Mother was often detached during visits. During one visit, D.B. began to cry and asked Mother why Mother used to leave D.B. alone, scream at her, and hit her; Mother responded that those things never happened, D.B. hid behind a curtain and "shut off from mom after that." *Tr*. at 78.

Mother called in a report to DCS that D.B. was being sexually abused by the foster parents and was not regularly brushing her teeth. D.B. was removed from the foster home for about a month while the allegations were investigated, but the report was unsubstantiated. Mother was upset when she found out that, contrary to her belief, D.B. would not be placed back in Mother's care when removed from the foster home. During this time, D.B.'s behavior regressed, and she experienced emotional trauma. When D.B. was returned to the foster parents, she had to undergo intensive services and eventually progressed. When Mother cancelled visits, D.B. became very upset, and the juvenile court ordered that visitation stop in August 2013 based on recommendations of D.B.'s therapist and service providers.

On August 6, 2013, DCS filed its petition to terminate Mother's parental rights. On December 4, 2013, an evidentiary hearing was held on the petition. At the hearing, FCM Megan Ruich testified that termination was in the best interests of D.B. because Mother had been given opportunities to address her substance abuse issues, such as a detox program, methadone treatment, or outpatient therapy, but Mother was not consistent with

6

services and continued to test positive for drugs. *Id*. at 34. FCM Luis Torres also testified that termination was in the best interests of D.B. because Mother was not able to provide the consistency that D.B. needed to thrive. *Id*. at 66. FCM Torres stated that Mother did not change her life style at all, and without a change, it would be difficult for Mother to comply with services and be able to parent D.B. *Id*. at 59-61. Faith Hayes, D.B.'s therapist, testified that termination was in D.B.'s best interests because, due to D.B.'s attachment and behavioral issues, she needs a safe, secure, and stable environment and that Mother was not able to put D.B.'s needs and feelings first. *Id*. at 75, 79. The plan for D.B. was for the foster parents to adopt her. On December 17, 2013, the juvenile court issued its order terminating Mother's parental rights to D.B. Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

Here, in terminating Mother's parental rights to D.B., the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings

7

of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

8

     (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  that termination is in the best interests of the child; and

(D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Mother argues that DCS failed to prove the required elements for termination by sufficient evidence. Mother specifically alleges that DCS failed to present sufficient evidence to prove that the conditions which resulted in D.B. being removed will not be remedied or that the continuation of the parent-child relationship poses a threat to D.B. She also asserts that insufficient evidence was presented to prove that it was in the best interests of the child that her parental rights be terminated. Mother additionally contends that DCS did not prove that there was a satisfactory plan for the care and treatment of D.B.

Initially, Mother's arguments consist of statements without citation to either legal authority or citation to the record. A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record. *Dickes v. Felger*, 981 N.E.2d 559, 562 (Ind. Ct. App. 2012) (citing *York v. Fredrick,* 947 N.E.2d 969, 979 (Ind. Ct. App. 2011), *trans. denied*). Consequently, Mother has waived her claims. Waiver notwithstanding, we will address Mother's arguments.

Mother's first contention is that DCS did not prove by clear and convincing evidence that the conditions that resulted in D.B.'s removal would not be remedied. When a juvenile court decides the issue of whether the conditions that led to a child's removal would be remedied, the juvenile court must assess a parent's fitness to care for his or her child at the time of the termination hearing. *In re D.D.*, 804 N.E.2d at 266. Additionally, a juvenile court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012)), *trans. denied*. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. *Id*. Parental rights may be terminated when parties are unwilling or unable to meet their parental responsibilities. *In re D.D.*, 804 N.E.2d at 265.

The evidence showed that DCS became involved with D.B. in January 2012 when the police were called to the home because Mother was experiencing severe withdrawal symptoms while the child was in the home. Mother had been attending a methadone program due to her addiction to pain pills, but had been kicked out of the program. D.B. was allowed to stay in the home with Mother if Mother maintained clean drug screens. In March 2012, Mother tested positive for methadone, THC, benzodiazepines, opiates, and cocaine, and D.B. was removed from the home. Mother was offered several services through DCS, but she was not compliant with the services, did not complete the ordered assessments, and failed to meet with service providers. Mother also continued to test

positive on her drug screens and would appear at visitations with D.B. under the influence of illegal substances. After her visitations were suspended in May 2012 due to her failure to comply with services and her repeated positive drug screens, Mother began to participate in services and had several clean drug screens. Visitation was restored in February 2013; however, she again tested positive for drugs other than methadone in March 2013 and had four more screens come back positive for THC. During this time, Mother's methadone levels were unknown because she never signed the releases so DCS could monitor her compliance with the court's orders, and she refused to participate in an inpatient program for her addiction. Although Mother requested services in July 2013 and agreed to participate, the providers were never able to contact her, and she tested positive for cocaine. All services were stopped in August 2013.

This evidence demonstrated that Mother continued to use drugs from the beginning of the CHINS case, which resulted in D.B. being removed, and throughout the duration of the case. She tested positive for many different drugs over the course of the CHINS case, which resulted in her visitations with D.B. being suspended. Mother also refused to participate in an inpatient detox program despite several recommendations and a court order to do so and failed to sign the releases requested by DCS to monitor her participation in services, including her methadone treatment. She also failed to consistently comply with services and attend visitation with D.B. We, therefore, conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal of D.B. from Mother's care would not be remedied.

Mother next contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship

11

posed a threat to the well-being of D.B. At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of D.B. from Mother's care would not be remedied, we need not address Mother's argument on this element.

Mother's next argument is that insufficient evidence was presented to prove that termination was in the best interests of the child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied).* The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

The record is clear that D.B. needed stability and a sense of permanency in order to foster her physical, mental, and social growth. At the time of the termination hearing, D.B.

had been removed from Mother's care and had been in the care of the foster parents for almost twenty-one months. During that time, Mother continued to abuse drugs and failed to participate in services. The evidence showed that D.B. had been diagnosed with symptoms of reactive attachment disorder related to her history with Mother. While in the care of the foster parents, she participated in weekly counseling and was excelling in school. However, D.B.'s behavior and relationship with Mother regressed during and after visitation, and there was no affection between Mother and D.B. During one visit, D.B. began to cry and asked Mother why Mother used to leave D.B. alone, scream at her, and hit her. When Mother cancelled visits, D.B. would became very upset, and the juvenile court ordered that visitation stop in August 2013 based on recommendations of D.B.'s therapist and service providers. At the termination hearing, FCM Ruich testified that termination was in the best interests of D.B. because Mother had been given opportunities to address her substance abuse issues, but Mother was not consistent with services and continued to test positive for drugs. *Tr.* at 34. FCM Torres also testified that termination was in the best interests of D.B. because Mother was not able to provide the consistency that D.B. needed to thrive and that Mother had not changed her life style at all, and without such a change, it would be difficult for Mother to comply with services and be able to parent D.B. *Id*. at 59-61, 66. D.B.'s therapist testified that termination was in D.B.'s best interests because, due to D.B.'s attachment and behavioral issues, she needed a safe, secure, and stable environment and that Mother was not able to put D.B.'s needs and feelings first. *Id*. at 75, 79. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interests of D.B.

13

Mother's final argument is that DCS failed to prove by clear and convincing evidence that there was a satisfactory plan for the care and treatment of D.B. In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* Here, DCS's plan was for D.B. to be adopted by the foster parents. Therefore, the evidence supports the juvenile court's finding that DCS had a satisfactory plan for the care and treatment of D.B. *See In re D.D.,* 804 N.E.2d at 268 (concluding that State's plan for child to be adopted by current foster parents or another family constitutes suitable plan for child's future care).

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to D.B. was clearly erroneous. Further, Mother's arguments are merely a request for us to reweigh the evidence and judge the credibility of the witnesses, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. We therefore affirm the juvenile court's judgment.

Affirmed.

BAKER, J., and ROBB, J., concur.

14